**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **WALLACE MCKENZIE,** | : | Case No. 5:12 CV 00024 |
| Plaintiff, | : | |
| v. | : | |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | **MEMORANDUM  DECISION  &  ORDER** |
| Defendant. | : | |

### I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties have consented to have the undersigned Magistrate judge conduct all proceedings including the entry of a final judgment.  Plaintiff seeks judicial review of Defendant's final determination denying his claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  The issues before the Court are presented in Briefs filed by the parties and Plaintiff's Reply Brief (Docket Nos. 18, 19 & 20).  For the reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

### II. FACTUAL & PROCEDURAL BACKGROUNDS.

Plaintiff filed two applications on May 26, 2009, one for DIB and one for SSI.  Both applications alleged that Plaintiff became unable to work because of his disabling condition which

began on March 26, 2008 (Docket No. 12, pp. 123-125, 130-131 of 768).  Both claims were denied

initially and upon reconsideration (Docket No. 12, pp. 87-90; 99-101, 103-105, 107-109 of 768).  An

administrative hearing was conducted on February 15, 2011, in Akron, Ohio, and on February 23,

2011, Administrative Law Judge (ALJ) Thomas A. Ciccolini determined that Plaintiff was neither

entitled to a period of disability nor eligible for SSI (Docket No. 12, pp. 11- 25 of 768).  The Appeals

Council denied Plaintiff's request for review on November 4, 2012 (Docket No. 12, pp. 5-7 of 768).

A.    THE ADMINISTRATIVE HEARING.

At the administrative hearing, Plaintiff appeared, with counsel, and testified.  Lynne Smith,

a Vocational Expert (VE), also appeared and testified (Docket No. 12, p. 31 of 768).

1.    PLAINTIFF'S TESTIMONY.

Plaintiff is a high school graduate.  At the time of hearing, he was 39 years of age, married and

had three dependant children, ages 18, 12, and 9.  He was Medicaid eligible and had received a

settlement through workers' compensation.  Plaintiff did not have a valid driver's license, and as

recently as a year preceding the hearing, he completed rehabilitation for cocaine abuse.  He admitted

that he "slipped" once; however, he testified that  he was able to regain and maintain sobriety.

Plaintiff contends that his use of cocaine or any other substance had nothing to do with his disabling

condition (Docket No. 12, pp. 34-35; 36-37; 38; 49 of 768).

a.    EMPLOYMENT HISTORY.

During his years of employment from 1989 to 2008, Plaintiff held  four positions maintaining

and repairing machinery at various factories and worked 5-7 days per week at each place of

employment.  Plaintiff's positions during this time period required him to frequently lift objects

ranging in weight from twenty-five pounds to fifty pounds and occasionally required lifting objects

more than one hundred pounds.  Plaintiff's most recent employment was from June 2006 until March of 2008.  Plaintiff alleges that his disability began on March 26, 2008 as a result of a work-related injury (Docket No. 12, p. 169 of 768).

      **b.**     **IMPAIRMENTS**.

Plaintiff testified that while working on a brake press machine, a hydraulic leak occurred. While taking the machine apart, he stood up and fell backwards.  Landing on concrete, he hit the back of his head, shoulder and tail bone.  He speculated that he fractured his tail bone.  Following the injury, Plaintiff tried to return to work but was only able to work a half day.  He tried to return to work again two weeks later, but again was only able to work a half day.  His back condition has stabilized with therapy (Docket No. 12, pp. 38, 39 of 768).      During the course of the hearing, Plaintiff complained that his leg was numb (Docket No. 12, p. 50 of 768).

      **c.**     **RESIDUAL FUNCTIONAL CAPACITY**.

Plaintiff testified that he can only stand or walk for fifteen to thirty minutes at a time, that he can only sit for fifteen to thirty minutes at a time, that he only sleeps two hours a night, and that he cannot lift more than twenty pounds (Docket No. 12, pp. 39, 40 of 768).

When shopping for groceries, Plaintiff drove an electric scooter.  His children carried the groceries into the house.  Plaintiff started the washer and folded the clothing.  His children carried the laundry and loaded it (Docket No. 12, pp. 40-41 of 768).

      **d.**     **MEDICATIONS AND PHYSICAL THERAPY**.

Plaintiff was prescribed Percocet, a schedule II controlled substance indicated for the relief of moderate to moderately severe pain and Zanaflex, a muscle relaxer (Docket No. 12, p. 36 of 768; PHYSICIAN'S DESK REFERENCE, 2006 WL 368853 (2006); www.drugs.com.)

3

Plaintiff testified that he attended vocational rehabilitation after his injury with the hope of returning to work.  He testified that vocational rehabilitation ceased once his worker's compensation claim was finalized.  At that point in time, Plaintiff had only participated in physical therapy.  Once he was awarded worker compensation benefits, payment for vocational training ceased (Docket No. 12, p. 49 of 768).

        2.    THE VE'S TESTIMONY.

The VE reviewed portions of the record that pertained to work history.  Based on her review, she categorized Plaintiff's past relevant work consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT) as he performed it at four different companies:

| JOB & DOT NUMBER | EXERTIONAL LEVEL | SPECIFIC VOCATIONAL PREPARATION (SVP) | SKILL LEVEL |
|---|---|---|---|
| F a c t o r y - t y p e maintenance 899.684-022 | **Very Heavy** work involves lifting more than 100 pounds at a time with frequent lifting and carrying objects weighing 50 pounds or more. 20 C. F. R. §§ 404.1567; 416.967. | **5**–the amount of lapsed time required for the typical worker to learn the techniques, acquire the information, and develop the facility needed to perform these specific jobs is over six months up to and including one year www.onetonline.org/help/online /svp. | **Skilled work** requires qualifications in which the person uses judgment to determine the machine and manual operations to be performed in order to perform the proper form, quality, or quantity of material to be produced. 20 C. F. R. §§ 404.1568(c), 416.968. |

(Docket No. 12, p. 35 of 768).

The ALJ determined that the hypothetical individual could no longer perform factory-type maintenance so the ALJ posed a series of hypothetical questions pertaining to an individual that was similar to Plaintiff in age, education and functional capacities.  This hypothetical individual could lift ten pounds frequently, twenty pounds occasionally, carry ten pounds frequently, twenty pounds occasionally, push ten pounds frequently, twenty pounds occasionally, pull ten pounds frequently,

twenty pounds occasionally, and could sit and stand six hours in an eight-hour work day, with a brief sit/stand option, and walk six hours in an eight-hour workday. The work for this individual was to be fairly simple, repetitive, and not complex, and would not involve bargaining, negotiating, or mediating. The work environment should be free of unprotected heights such as ladders and scaffolds (Docket No. 12, pp. 41-42 of 768).

In response to the ALJ's hypothetical, the VE analogized the hypothetical individual's age, education, residual functional capacity and past relevant jobs with entries in the DOT, sufficient to identify potential jobs that the hypothetical individual could perform at the specific exertional, skill, and SVP levels. The VE testified that the hypothetical individual could perform the following jobs that were available in the national economy:

| JOB & DOT | EXERTIONAL LEVELS | SVP | SKILL LEVEL |
|---|---|---|---|
| Buffing Machine Tender DOT 660.665-010 | **Light work** involves lifting no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up to 10 pounds. A job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C. F. R. § 1567 (b) (Docket No. 12, p. 45 of 768). | **2**--the amount of lapsed time required for the typical worker to learn the techniques, acquire the information, and develop the facility needed to perform these specific jobs is anything beyond short demonstration up to and including 1 month | **Unskilled work** is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C. F. R. § 1568(a). |
| Assembly Press Operator DOT 690.685-014 | Light work | 2 | Unskilled work |
| Plate Stamper DOT 652.685.054 | Light work | 2 | Unskilled work |

(Docket No. 12, p. 42 of 768).

The VE testified that there were one thousand buffing machine tender jobs in the local area, five thousand in the state, and sixty thousand nationally. There were three thousand, assembly press operator jobs in the local area, thirty-five thousand in the state, and nine hundred thousand nationally.

5

Finally, there were one thousand two hundred plate stamper jobs in the local area, six thousand in the state, and one hundred ninety thousand nationally (Docket No. 12, p. 42 of 768).

Counsel for Plaintiff asked the VE to consider the ALJ's hypothetical and in addition to add the restrictions that the person can only stand or walk for twenty to thirty minutes at a time and the person can only sit for twenty to thirty minutes for a single time. Although her response is ambiguous, the gist is that the aforementioned jobs could not be done if the hypothetical individual had to stand for twenty or thirty minutes at a time and then walk for twenty or thirty minutes at a time because the hypothetical individual would be away from the work station too long in order to maintain the job. The VE further testified that if the hypothetical person needed to lie down for substantial periods of the day, he or she would be effectively removed from the workforce and that no jobs would be available (Docket No. 12, pp. 45, 46, 47 of 768).

### III. THE MEDICAL EVIDENCE.

The cornerstone for the determination of disability under both Title II and Title XVI is the medical evidence. Each person who files a disability claim is responsible for providing medical evidence from sources who have treated or evaluated the claimant, determined that the impairment exists and assessed the severity of that impairment. 20 C. F. R. § 404.1512((b), (c) (Thomson Reuters 2012). A chronological review of Plaintiff's medical treatment arising eight years before the onset of disability follows.

### 1.  TREATMENT BASED ON PHYSICAL EXAMINATION.

Plaintiff was treated at the Akron General Medical Center (AGMC) emergency room for back pain on February 27, 2000. Diagnosed with thoracic/lumbar strain, Plaintiff was discharged with prescriptions for a pain medication and a muscle relaxant (Docket No. 12, pp. 403-404 of 768).

Plaintiff presented to the AGMC emergency room on June 25, 2001 with cephalgia, complaining that his pain had persisted for the last three nights. According to the results from the CT scan, there was no evidence of an intra-cranial abnormality. Plaintiff was discharged with pain medication (Docket No. 12, pp. 395-396, 401 of 768).

Plaintiff was awakened by upper back pain on June 6, 2003. On June 9, 2003, he presented to the AGMC for treatment of back pain that he attributed to a pulled muscle. Plaintiff was diagnosed with acute myofascial strain, discharged with pain medication and instructed to follow-up with his treating physician (Docket No. 12, pp. 391-392 of 768).

Plaintiff was treated for ear pain on November 1, 2007 at the AGMC emergency room. After being diagnosed with bronchitis and left middle ear effusion presumably resulting from the respiratory symptoms, Plaintiff was prescribed medication to dry up his secretions and resolve the problems with his ear (Docket No. 12, pp. 387-388 of 768).

On February 22, 2008, Dr. Michael Wells, D.O., conducted a new patient evaluation, acknowledging that Plaintiff's symptoms were generally related to hypertension, sleep apnea, snoring, malaise, fatigue and gastroesophageal reflux disease (GERD). A basic metabolic panel, a complete blood count and a lipid panel were ordered. Test results showed that Plaintiff's glucose, cholesterol and triglyceride levels were elevated. His red blood count was lower than normal (Docket No. 12, pp. 351-352, 353-356 of 768).

On March 26, 2008, Plaintiff presented to the emergency room at AGMC now known as Akron General Health System (AGHS) with complaints that he hurt his "tailbone." After an examination, Dr. John Bradford diagnosed him with a sacrococcygeal contusion (referring to both sacrum and coccyx) and a thoracic strain. Once Plaintiff was stabilized, Dr. Bradford discharged him

7

with prescriptions for Vicodin and Motrin, both pain relievers and recommended follow up care at Concentra Medical Center (Concentra) (Docket No. 12, pp. 222-224, 288 of 768; STEDMAN'S MEDICAL DICTIONARY 361780(27th ed. 2000)).

Plaintiff claims that he injured his back when he slipped on hydraulic fluid on March 26, 2008 while working. On March 31, 2008, Plaintiff followed Dr. Bradford's recommendation and presented to Concentra. There he was examined by Dr. Chris D. Marquart, M.D., who determined that there was no apparent distress in his shoulders except for ecchymosis (a purplish patch caused by a substance exuding from blood into the skin) posteriorly. Plaintiff's cervical range of motion was normal as was his range of motion in both his trunk and elbows. Plaintiff's head was normal except for mild swelling in the left posterior occiput. The examination of his spine and lower back revealed no: (1) swelling, (2) ecchymosis, (3) changes to the curvature of the spine, or other abnormalities, (4) abnormalities in gait; (5) abnormalities in lumbar range of motion on any planes; and (6) abnormal sensation levels. Palpation was positive for pain at the saccral area and the coccyx. Apparently none of these problems limited Plaintiff's ability to perform the essential functions of work so Dr. Marquart authorized Plaintiff's return to work provided he observed the following restrictions until his next physician's appointment: (1) no lifting over ten pounds; (2) no prolonged standing and/or walking longer than fifteen minutes per hour, (3) no bending, (4) no pushing or pulling over ten pounds of force, and (5) no squatting or kneeling. In addition, physical therapy was recommended (Docket No. 12, pp. 301-304 of 768; STEDMAN'S MEDICAL DICTIONARY 123140, 144180 (27th ed. 2000)).

On April 1, 2008, Plaintiff returned to Concentra for follow up care of his contusions to the buttocks, face/scalp and shoulder. Dr. Marquart evaluated Plaintiff's progress with physical therapy, noting that little progress had been made. Plaintiff complained that he could not perform the essential

8

functions of the job so Dr. Marquart continued the structured physical therapy program and previous medications, focusing on functional outcomes that would help Plaintiff return to work Plaintiff was released to return to work provided he did not lift more than ten pounds, did not engage in prolonged standing and/or walking longer than fifteen minutes, no bending, no pushing and/or pulling and no squatting and/or kneeling (Docket No. 12, pp. 305-307 of 768).

On April 3, 2008, Plaintiff presented to Concerta for a recheck of his contusions. Again, Plaintiff was released to return to work provided he did not: lift more than ten pounds; engage in prolonged standing and/or walking longer than fifteen minutes; bend, push and/or pull, squat and/or kneel (Docket No. 12, p. 308 of 768).

On April 4, 2008, Plaintiff presented to Dr. Wells complaining of a painful tail bone. Plaintiff remarked that he smoked two packs per day and was a social drinker who drank ½ of a fifth of vodka and 15 to 20 beers daily, but that he had been clean for seven days. Although there was evidence of a sprain in the lumbar region and lumbosacral region, Dr. Wells noted a normal range of motion of the spine. Dr. Wells diagnosed Plaintiff with a contusion of the buttocks, sprain lumbar region, and sprain lumbosacral (Docket No. 12, pp. 297-298, 307 of 768).

On April 11, 2008, Plaintiff returned to Dr. Wells, complaining of back pain from the fall. He reported tingling and numbness in his left leg. Upon examination, Dr. Wells diagnosed Plaintiff with low back pain, radiculopathy, herniated disc syndrome, and hypertension. He ordered a magnetic resonance image (MRI) of the lumbosacral spine. Dr. Wells continued Plaintiff's medication and ordered diagnostic testing (Docket No. 12, pp. 293-294, 299-300 of 768).

An overnight Polysomnogram was performed on April 21, 2008. Plaintiff's sleep efficiency was measured at 56.2%, his sleep onset latency was normal and there was an absence of REM sleep (that state of deep sleep in which rapid eye movements, alert electroencephalography patterns, and

9

dreams occur).  The results from the electrocardiogram demonstrated a sinus rhythm with a normal heart rate (Docket No. 12, pp. 361-362 of 768; STEDMAN'S MEDICAL DICTIONARY, 375350 (27th ed. 2000)).

The results of a MRI performed on April 22, 2008 showed that:  (1) Plaintiff's lumbar vertebrae were well-aligned and demonstrated age appropriate marrow signal intensity; (2) at L4-L5, there was left posterior paramedian disc protrusion with focal annular signal abnormality suggesting partial tear; and (3) at L5-SL, and to a lesser extent L3-L4, discovertebral degenerative changes were present.  There was no prior study for comparison (Docket No. 12, p. 363 of 768).

Plaintiff saw Dr. Wells again on April 24, 2008, and complained of sharp lower back pain on the left side and sometimes on the right side.  Moving and laying down were behaviors that aggravated the pain.  A physical examination revealed normal reflexes, low back pain, spasms, and increased pain with extension.  Dr. Wells reviewed with Plaintiff the results from the MRI, finding that Plaintiff had herniated disc syndrome at L4-L5, radiculopathy, and a lumbosacral sprain.  Dr. Wells referred Plaintiff to Dr. Richard Scott Brower for treatment of the herniated disc and continued the prescriptions for pain medications (Docket No. 12, pp. 283-284 of 768).

On April 25, 2008, Plaintiff underwent an overnight Polysomnogram, after which it was determined that with weight loss and avoidance of alcohol, the aggressive treatment of nasal obstruction with a machine to provide continuous positive airway pressure (CPAP) would be helpful.  Apparently on April 28, 2008, the CPAP equipment was set up (Docket No. 12, pp. 358-360 of 768).

On May 14, 2008, Plaintiff followed up with Dr. Wells, complaining of a dull ache in his lower back most of the time with the occasional instance of sharp, shooting pain.  Plaintiff reported that his left leg pain  had improved.  Dr. Wells observed that he "clearly" had a herniated disc.  Upon further observation, Dr. Wells noted that lumbar flexion and extension had improved, yet Plaintiff still

10

experienced a lot of pain when bending to the side.  Dr. Wells diagnosed Plaintiff with a contusion of the buttock, sprain of sacrum, and sprain of lumbosacral joint or ligament.  By May 30, Plaintiff reported feeling better and had begun to do sit-ups (Docket No. 12, pp. 272-273, 342-343, 358 of 768).

On June 9, 2008, Plaintiff followed up with Dr. Wells complaining of sharp, continual lower back pain.  He denied gait abnormalities.  Plaintiff was able to bend forward but experienced pain when extending, bending to the side, and rotating. The result of a straight leg-raising test was negative (Docket No. 12 pp. 274-275 of 768).

Plaintiff followed up with Dr. Wells on July 30, 2008, complaining of low back pain that was just as severe as it was in March 2008, when Plaintiff was initially injured.  Dr. Wells noted that Plaintiff walked hunched over, had an antalgic gait and had a significantly reduced range of motion (Docket No. 12 pp. 269-270 of 768).

On November 13, 2008, Plaintiff presented to Dr. Brower complaining of chronic back pain due to his fall at work in March 2008.  He indicated that the pain radiated to his legs, the left more than the right.  Plaintiff identified himself as a pack a day smoker and a nondrinker.  Dr. Brower examined Plaintiff and found him to appear to be a muscular, healthy man with a reduced range of motion of the lower back with normal hypertension but "a bit over demonstrative on exam."  Plaintiff had minimal pain in response to superficial touch, and was not "particularly sore to whole body rotation."  There was a "little bit of disc space narrowing at L5-S1 but not very pronounced" and "just a little bit of a high intensity zone lesion in the back of L4-L5" and some degenerative disc disease. Dr. Brower concluded that Plaintiff was not a candidate for surgical intervention or a fusion so he recommended him for physical therapy that included stretching and strengthening exercises, and suggested he may be a candidate for epidural steroid injections (Docket No. 12, p. 262 of 768).

On November 24, 2008, Dr. Wells treated Plaintiff for hypertension and GERD.  He continued the medication for hypertension.  There was some suspicion that Plaintiff was diabetic (Docket No. 12, p. 264-265 of 768).

On January 14, 2009, Dr. Wells conducted a follow-up examination for workers' compensation.  Acknowledging that Plaintiff had limited success with pain management and that he was depressed because of his back pain and inability to work, Dr. Wells prescribed an antidepressant and reviewed Plaintiff's basic metabolic and liver function panel.  Plaintiff's blood sugar levels were "ok" (Docket No. 12, pp. 327-329 of 768).

On January 30, 2009, Plaintiff presented to Dr. Tony Lababidi, D.O., a board certified anaesthesiologist and pain management specialist, with complaints that he was unable to work due to pain in his knees.  Noting that Plaintiff had been taking eight pills per day, he changed Plaintiff's pain medications and recommended that Plaintiff undergo lumbar epidural steroid injections (Docket No. 12, pp. 595-597 of 786).

On February 12, 2009, Dr. Wells addressed the presence of lumbar disc displacement and lumbar sprain.  Medications initially prescribed for pain and to regulate hypertension were continued (Docket No. 12, pp. 325-326 of 768).

Plaintiff saw Dr. Wells on April 14, 2009, and explained that he was tolerating the hypertension medication well and he was complying with the treatment for sleep apnea.  Then on May 5, 2009, Plaintiff presented with elevated pulse and heart rates.  In addition, he suffered from dyspnea.  Dr. Wells ordered a basic metabolic panel and complete blood count (Docket No. 12, pp. 318-322, 323-324 of 768).

Dr. Lababidi administered a series of three lumbar epidural steroid injections, one injection each on April 22, 2009, June 1, 2009, July 2, 2009 (Docket No. 12, pp. 586-594 of 768).

On July 7, 2009, Dr. Wells continued the prescription of pain medication since Plaintiff's back pain persisted.  The dosage of medication prescribed to control hypertension was also adjusted (Docket No. 12, pp. 447-448 of 768).

On July 17, 2009, Dr. Wells ordered a MRI of Plaintiff's lumbar spine.  The MRI showed persistent slight disc bulging of L4-L5 causing a slight to mild bilateral lateral recess narrowing and a very slight central canal narrowing with no significant change from the test administered on April 22, 2008 (Docket No. 12 pp. 488-489 of 768).

On July 27, 2009, Plaintiff saw Dr. Lababidi and remarked that his lower back pain was getting worse.  He denied alcohol or substance abuse.  Dr. Lababidi examined Plaintiff and found no abnormalities in his cervical spine, no abnormalities palpated about the C-spine musculature and no abnormalities about the lumbar spine.  There was a normal range of motion of the lumbar spine and C-spine.  Plaintiff's muscles had soreness and spasms, and his lower back muscles and bilateral muscles palpated.  Dr. Lababidi began Plaintiff on a TENS unit to the lower back (Docket No. 12, pp. 521-523 of 768).

On August 4, 2009, Plaintiff complained to Dr. Wells that he was depressed and that his pain was "really bad."  Dr. Wells continued the medication prescribed for hypertension and low back pain (Docket No. 12, pp. 445-446 of 768).

On August 25, 2009, Plaintiff complained to Dr. Lababidi that he continued to have back pain. The prescription for pain medication was refilled (Docket No. 12, pp. 518-520 of 768).

When Dr. Wells saw Plaintiff on September 15, 2009, there was no evidence of elevated blood pressure, no chest pain and no dyspnea or edema.  Plaintiff advised that he had decreased his smoking significantly.  Plaintiff's back had a normal range of motion of the spines (Docket No. 12, pp. 443-446 of 768).

During an appointment with Dr. Lababidi on September 22, 2009, Plaintiff complained that the back pain with radiation down the bilateral lower extremities persisted and physical therapy had made the pain worse.  Dr. Lababidi suggested that he seek approval for additional injections (Docket No. 12, pp. 515-517 of 768).

Dr. Lababidi considered that Plaintiff needed a refill on his pain medication even though the TENS unit appeared to provide some pain relief.  It was Plaintiff's contention that physical therapy negatively affected his pain (Docket No. 12, pp. 512-514 of 768).

On October 20, 2009, Plaintiff saw Dr. Lababidi and reported that the TENS unit was helping with his pain.  Plaintiff denied substance or drug abuse. He denied muscle soreness or craps, but reported muscle twitching and back pain.   He also reported feelings of depression and trouble sleeping.  Upon examination, Dr. Lababidi found tenderness in the lumbar spine, muscle soreness and spasms and palpation of the lower back and bilateral muscles.  He also noted a normal range of motion of the lumbar spine.  Plaintiff had an antalgic gait and decreased sensation over the left medial thigh and leg (Docket No. 12, pp. 512-514 of 768).

On November 15, 2009, an MRI of the lumbar spine found a mild diffuse annular bulge and a small left paracentral disc herniation at L4·L5 causing only mild thecal sac deformity; disc osteophyte complex at L5-S1 with right foraminal extension that may be just contacting the exiting L5 nerve root without clear displacement (the patient denied any right sided symptoms); and no significant central canal or foraminal compromise in the lumbar spine (Docket No. 12, pp. 571-572 of 768).

On November 17, 2009, Plaintiff tested positive for cocaine (Docket No. 12, pp. 568-569 of 768).

Plaintiff followed up with Dr. Lababidi on December 15, 2009, and reported that he was still

14

using his TENS unit and that his pain was at a 2 on a scale of 1-10.  He denied substance or drug abuse as well as muscle pain, muscle cramps, muscle twitching, feelings of depression and trouble sleeping.  Upon examination, Dr. Lababidi noted tenderness in the lumbar spine musculature. Plaintiff had a normal range of motion of the lumbar spine, his muscles had soreness and spasms, and his lower back muscles and bilateral muscles were palpated.  Lumbar facet loadings were positive and straight leg testing was negative on both legs.  Plaintiff had an antalgic gait and decreased sensation over the left medial thigh and leg.  A motor examination revealed no abnormalities and normal reflexes.  Dr. Lababidi recommended Plaintiff receive left side facet blocks and ordered a drug test. Results from the specimen colleted on December 16, 2009, were positive for cocaine (Docket No. 12, pp. 558-559, 562, 565-567 of 768).

On January 12, 2010, Plaintiff followed up with Dr. Lababidi.  Plaintiff described his pain as at worst 10, at least 5, and on average 7 on a 1-10 scale.  He denied substance or drug abuse.  Upon examination, Dr. Lababidi noted  tenderness in the lumbar spine musculature, a normal range of motion of the lumbar spine, muscle soreness and spasms, and palpated lower back and bilateral muscles. Straight leg-raising tests were negative on both legs (Docket No.12, pp. 559-561 of 768).

On January 19, 2010, Dr. Lababidi administered left side facet blocks (Docket No.12 p. 558 of 768).

On March 8, 2010, Plaintiff presented to Dr. Norman Lefkovitz, M.D., complaining of pain radiating into his lower extremities, left greater than right.  During this initial assessment, Plaintiff denied any illicit drug use.  Dr. Lefkovitz examined Plaintiff and concluded that his motor strength was 5/5, his deep tendon reflexes were 2+, and his sensation was normal.  Plaintiff did have a positive straight leg raise affecting his lower extremities that was more pronounced on the left side (Docket No. 12, pp. 762-763 of 768).

15

On March 11, 2010, Dr. Wells discussed the presence of a cyst in Plaintiff's kidney.  Plaintiff advised that he had constant abdominal pain.  Further diagnostic imaging and  metabolic and liver panels were ordered (Docket No. 12, pp. 609-613 of 768).

On April 13, 2010, Plaintiff saw Dr. Lefkovitz for follow-up care.  Plaintiff claimed that with the TENS unit, his pain was reduced from 7 to 2 approximately five days weekly.  Plaintiff's range of motion in the lumbar spine was 40 degrees with forward flexion, 10 degrees with extension, and 10 degrees with lateral flexion bilaterally and his motor strength was 5/5, sensation normal, gait antalgic,  His deep tendon reflexes were 2-3+ bilaterally and symmetric, and a straight leg raising was positive bilaterally in the lower extremities (Docket No. 12, pp. 723-724 of 768).

Consistent with Plaintiff's request, on April 16, 2010, Dr. Lefkovitz requested approval for Plaintiff to undergo a nerve conduction/EMG study done to properly determine whether Plaintiff had any significant radiculopathy affecting his lower extremities (Docket No.12, p. 757 of 768).

On May 20, 2010, Dr. Lefkovitz examined Plaintiff again.  The examination showed lumbar spine tenderness and tightness to palpation, 5/5 motor strength throughout, normal sensation, deep tendon reflexes that were 2-3+ and symmetric bilaterally, normal extremity tone, and antalgic gait.  A straight leg raising test was positive bilaterally in the lower extremities (Docket No. 12, pp. 715 of 768).

On May 27, 2010, Plaintiff reiterated to Dr. Lefkovitz that his TENS unit reduced his pain from 7 to 2.  Dr. Lefkovitz examined Plaintiff and found lumbar spine muscle tenderness and tightness to palpation, along with an antalgic gait (Docket No. 12, pp. 713-714 of 768).

On June 8, 2010, told Dr. Lefkovitz the TENS unit reduced his pain from 8 to 5. An examination found Plaintiff's range of motion of the lumbar spine was 45 degrees with forward flexion, 10 degrees with extension, and 10 degrees with lateral flexion bilaterally (Docket No. 12,

16

p. 709 of 768).

Dr. Wells noted on June 15, 2010 that Plaintiff was tolerating his medications, exercising, and had gone through rehabilitation for cocaine. An examination revealed a normal range of motion of the spines (Docket No. 12, pp. 688-689 of 768).

On June 17, 2010, Dr. Lefkovitz noted that Plaintiff had not been provided medications from his office due to past drug history. However, Plaintiff was slated to obtain supplies for the TENS unit through his office because it reduced Plaintiff's pain from eight to five. Dr. Lefkovitz described Plaintiff as "currently disabled" and he noted that therapy was helping. Results from the nerve conduction study conducted on Plaintiff's lower extremities were normal (Docket No. 12, pp. 707-708 of 768).

On June 24, 2010, Dr. Lefkovitz examined Plaintiff again and found lumbar spine muscle tenderness. He also noted Plaintiff had an antalgic gait and his motor strength 5/5 throughout. More importantly, use of the TENS unit reduced the severity of his pain from an eight to a five (Docket No. 12, pp. 705-706 of 768).

On July 9, 2010, Dr. Lefkovitz obtained the results of an electromyography study or nerve conduction test of Plaintiff's lower extremities. Results form the study were normal with associated bilateral L4-S1 paraspinal muscles (Docket No. 12, p. 704 of 768).

Plaintiff saw Dr. Lefkovitz again on August 24, 2010 and September 14, 2010. During each visit, Dr. Lefkovitz noted that Plaintiff's range of motion of the lumbar spine of 45 degrees with forward flexion, 10 degrees with extension, and 10 degrees with lateral flexion bilaterally. The TENS unit used on a regular basis reduced his pain and that active physical therapy through vocational rehabilitation assisted with controlling the low back pain (Docket No. 12, pp. 700-703 of 768).

On October 14, 2010, Dr. Lefkovitz found that the TENS unit was effective with regular use and that therapy was helpful.  At that time, Plaintiff was actively doing work conditioning, including physical therapy, as a part of vocational rehabilitation.  His range of motion in the spine was 45 degrees with forward flexion, 10 degrees with extension, and 10 degrees with lateral flexion bilaterally (Docket No. 12, pp. 694, 696 of 768).

On October 22, 2010, Plaintiff returned to Dr. Wells, hoping to reduce his pain so he could return to work again.  Dr. Wells determined that Plaintiff's lower back pain was stable and that Plaintiff felt well.  Medications for the treatment and control of hypertension and herniated disc syndrome were prescribed (Docket No. 12, pp. 690-693 of 768).

A.     PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT COMPLETED BY DR. GARY HINZMAN, M. D., STATE AGENCY EXAMINER, ON AUGUST 14, 2008

Based on all of the evidence as well as his reasoned judgment, Dr. Hinzman determined that Plaintiff could:

1.     Occasionally lift and/or carry twenty pounds;
2.     Frequently lift and/or carry ten pounds;
3.     Stand and/or walk about six hours in an eight-hour workday;
4.     Sit with normal breaks for a total of about six hours in an eight-hour workday; and
5.     Push and/or pull on an unlimited basis.

Regarding postural limitations, Dr. Hinzman found that Plaintiff would have frequent limitations on climbing ramps or stairs, occasional limitations for climbing ladders, ropes or scaffolds, and occasional limitations on stooping, kneeling, crouching, and crawling.  Dr. Hinzman stated that Plaintiff's claim that he could only walk for ten minutes and sit for thirty minutes was not supported by the objective medical evidence in the file (Docket No. 12, pp. 430-437 of 768).

B.     FUNCTIONAL CAPACITY EVALUATION COMPLETED BY DR. LEFKOVITZ ON DECEMBER 17, 2010.

Based on his treatment notes, Dr. Lefkovitz opined that Plaintiff could:

1.   Stand or walk two hours out of an eight-hour workday;
2.   Stand or walk for twenty to thirty minutes at a time;
3.   Sit for four hours out of an eight-hour workday;
4.   Sit for twenty to thirty minutes at a time;
5.   Can occasionally lift up to ten pounds;
6.   Occasionally lift eleven to twenty pounds;
7.   Never lift twenty-one to fifty pounds;
8.   Never lift in excess of fifty pounds;
9.   Occasionally work above the shoulder level;
10.  Occasionally bend, twist, or turn at the waist;
11.  Occasionally squat;
12.  Never crawl;
13.  Occasionally climb;
14.  Occasionally push or pull.

(Docket No. 12, p. 768 of 768).

**2.    IMPAIRMENTS BASED ON MENTAL EXAMINATION.**

Dr. Wells saw Plaintiff on September 15, 2009, six weeks after the dosage of Wellbutrin, a medication generally used to treat major depressive disorder, had been increased.  There is no indication that the Wellbutrin was successful in moderating Plaintiff's symptoms of depression (Docket No. 12, pp. 215, 443-446 of 768).

**A.    DISABILITY ASSESSMENT REPORT.**

On December 9, 2009, Dr. Sudhir Dubey, PH. D., a clinical psychologist, conducted a clinical interview for the purposes of completing this report as it relates to Plaintiff.  Plaintiff denied being on medication or drugs which may have affected his ability to complete the evaluation, but identified past abuses of alcohol and cocaine until two years ago.  The final diagnosis:

Axis I:           307.89 pain disorder with general medical and psychological factors.
Axis II:       V71.09 no diagnosis.
Axis III:      Back pain.
Axis IV:      Health and Functional Changes.
Axis V:       A global assessment of functioning score or a comprehensive diagnosis that considers the complete picture of the entire scope of psychological, social and occupational functioning on a hypothetical continuum.  Here, Dr. Dubey attributed a score of 65 which denotes the presence of mild symptoms  (e.g.,

19

depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships

(Docket No. 12, pp. 535-540 of 768).

**B.**     **PSYCHIATRIC REVIEW TECHNIQUE.**

Having reviewed the medical record as a whole, Dr. Carl Tishler, Ph. D., a psychologist, made the following assessment of Plaintiff's mental health applicable from March 26, 2008 through December 30, 2009.  Diagnosing Plaintiff with a pain disorder with general medical and psychological factors, Dr. Tischler noted that the degree of functional limitations resulting from Plaintiff's psychological features was:

| | | |
|---|---|---|
| 1. | Restriction of Activities of Daily Living | None. |
| 2. | Difficulties in Maintaining Social Functioning | None. |
| 3. | Difficulties in Maintaining Concentration Persistence or Pace | None. |
| 4. | Episodes of Decompensation, each of Extended Duration | None. |

(Docket No. 12, pp. 541-552 of 768).

**IV.  STANDARD OF DISABILITY DETERMINATION.**

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively.  DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. §

20

416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

### V. THE ALJ'S FINDINGS.

Having considered the standard of disability, medical evidence and testimony of Plaintiff and the VE, the ALJ found that:

(1)     Plaintiff met the insured status requirements of the Act through December 31, 2013.
(2)     Plaintiff had not engaged in substantial gainful activity since March 26, 2008, the alleged onset date (20 C. F. R. §§ 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

21

(3) Plaintiff has the following severe impairments: degenerative disc disease; obstructive sleep apnea; obesity; depression; pain disorder; and cocaine abuse (20 C. F. R. §§ 404.1520(c) and 416.920(c)).

(4) Plaintiff's impairments, including the substance use disorder, meet section 12.06 of 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. §§404.1520(d) and 416.920(d)).

(5) If the Plaintiff stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the Plaintiff would continue to have a severe impairment or combination of impairments.

(6) If Plaintiff stopped the substance use, the Plaintiff would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. §§404.1520(d) and 416.920(d)).

(7) If Plaintiff stopped the substance use, the claimant would have the residual functional capacity to perform a significant range of light work as defined in 20 C. F. R. §§ 404.1567(b) and 416.967(b).  Specifically, he can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently.  He can sit for six hours and stand and/or walk for six hours in a normal workday with a brief sit-stand option that allows him to stretch.  He can continue to work during periods of the sit-stand option.

(8) If Plaintiff stopped the substance use, the Plaintiff would be unable to perform past relevant work (20 C. F. R. §§ 404.1565 and 416.965).

(9) Plaintiff was born on March 19, 1971 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset (20 C. F. R. §§404.1563 and 416.963).

(10) Plaintiff has at least a high school education and is able to communicate in English (20 C. F. R. §§404.1564 and 416.964).

(11) Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules as a framework supports a finding that the Plaintiff is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C. F. R. Part 404, Subpart P, Appendix 2).

(12) If Plaintiff stopped the substance use, considering the Plaintiff's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the Plaintiff could perform (20 C. F. R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966).

(13) Because Plaintiff would not be disabled if he stopped the substance use (20 C. F. R. §§ 404.1520(g) and 416.920(g)), the Plaintiff's substance use disorder is a contributing factor material to the determination of disability (20 C. F. R. §§ 404.1535 and 416.935).  Thus, Plaintiff has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Docket No. 12, pp. 12-21 of 768).

## VI.  THIS COURT'S JURISDICTION, SCOPE AND STANDARD OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant

to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g).  The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.  *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)).  The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . .  *Id.*  This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

### VII. ANALYSIS.

Plaintiff claims that:

(1)     The ALJ's decision contains errors of law because it failed to properly weigh the treating source evidence.
(2)     The ALJ substituted his own judgment for those of the medical experts.

Defendant counters with:

(1)     The Act prohibits an individual disabled by substance abuse from receiving Social Security Disability Benefits.
(2)     Substantial evidence supports the ALJ's decision that Dr. Lefkovitz's conclusory and unsupported opinion was entitled to little weight.

23

(3)     The ALJ followed the controlling regulations in weighting the opinion evidence against the other evidence in the record.

**1.     THE TREATING SOURCE RULE AND ANALYSIS.**

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight. *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. § 404.1527(d)(2)). "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir.2007)).  Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir.2007)).  Opinions of specialist with respect to the medical condition at issue are given more weight than a nonspecialist. *Johnson, supra*, (*citing* 20 C. F. R. § 404.1527(d)(5)).

In *Wilson v. Commissioner of Social Security,* 378 F.3d 541 (6th Cir.2004), the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination. *Harris v. Commissioner of Social Security*, 2011 WL

24

5523669, *3 (N.D.Ohio,2011). The court noted that the regulation expressly contains a "good reasons" requirement. *Id.* (*citing and quoting* 20 C.F.R. § 404.1527(d)(2)). The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.
- Identify evidence supporting such finding.
- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Id.* (*citing Wilson,* 378 F. 3d at 546).

The Court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error, drawing a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business. *Id.* The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error. *Id.* It concluded that the requirement in Section 1527(d)(2) for articulation of good reasons for not giving controlling weight to a treating physician's opinion created a substantial right exempt from the harmless error rule. *Id.*

In judging compliance with the treating source rule, the ALJ considered Dr. Lefkovitz an acceptable medical source who, according to the medical records, provided limited medical treatment and evaluation for pain during an eight-month relationship that lasted from March 2010 through October 2010. During this time, Dr. Lefkovitz supervised Plaintiff's use of a TENs unit, performed a nerve conduction study, charted Plaintiff's range of motion and otherwise, attempted to control Plaintiff's pain (Docket No. 12, pp. 21, 22-23 of 768).

Dr. Lefkovitz's opinion was inconsistent with the opinion of Dr. Wells, who the ALJ noted saw Plaintiff "as much if not more than Dr. Lefkovitz did and his examinations were unremarkable" (Docket No. 12, pp. 19 of 768). Dr. Wells' treatment notes substantiate this claim. Dr. Wells noted

no irregularities and a normal range of motion of the spine during examinations with Plaintiff on April 4, 2008, September 15, 2009 and October 20, 2009.  Coincidentally, during the time when Plaintiff's care from Drs. Wells and Lefkovitz overlapped, Dr. Wells found no irregularities or restrictions in range of motion (Docket No.12, pp. 657, 621, 574, 609 of 768).  The April 4, 2008-examination is of particular note due to its proximity to Plaintiff's injury date.  On June 9, 2008, Plaintiff was able to bend forward during an examination with Dr. Wells (Docket No. 12, p. 649 of 768).  On May 30, 2009, Plaintiff even informed Dr. Wells that he was feeling better, that he had started doing sit-ups, and that he wanted to return to work (Docket No. 12, pp. 647 of 768).

The ALJ notes that Dr. Lefkovitz's opinions are also inconsistent with the findings of Dr. Lababidi, who also treated Plaintiff frequently.  The record substantiates this claim as well.  On January 30, 2009, July 27, 2009, August 25, 2009, and September 22, 2009, Dr. Lababidi examined Plaintiff and found no abnormalities upon inspection of the spine and a normal range of motion of the spine (Docket No. 12, pp. 594, 579, 576, 573 of 768).

The ALJ considered that Dr. Lefkovitz's specialization was limited to pain management, therefore the nature and extent of his treatment relationship with Plaintiff was limited to assessing Plaintiff's muscles tenderness, gait and range of motion.  The ALJ was not persuaded that Dr. Lefkovitz's opinions were supported by or consistent with other treating physicians who clearly found only mild degenerative changes.  Yet, Dr. Lefkovitz found extreme limitations that were not only inconsistent with other treating sources, they were inconsistent with his own treatment notes.

Since the ALJ did not give controlling weight to Dr. Lefkovitz's opinions, he appropriately discounted such opinions  and relied on those opinions that were supported by laboratory techniques and were consistent with other medical evidence in the case record.  The ALJ identified the opinions

26

for which greater weight was attributed and explained the application of the "good reason" factors required to discount the opinion.  Having followed the rules, the ALJ's analysis is based on substantial evidence and is therefore adequate to support the decision to give Dr. Lefkovitz's opinions limited weight.

2.  **PLAINTIFF'S CLAIM THAT THE ALJ SUBSTITUTED HIS OWN OPINION FOR THAT OF THE MEDICAL EXPERTS**

Plaintiff suggests that the ALJ substituted his own opinion for those of the medical experts when he failed to include all of the postural limitations given by Drs. Lefkovitz and Hinzman in the residual functional capacity assessment and then failed to give definitive weight to Dr. Lefkovitz's opinion that Plaintiff is disabled.  Plaintiff seemingly argues that the ALJ's residual functional capacity determination should have concluded after incorporating only the opinions of Drs. Lefkovitz and Hinzman and the ALJ was bound by Dr. Lefkovitz's opinion on disability.

"Residual functional capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." *Prescott v. Astrue,* 2012 WL 3403604, *12 (M.D.Tenn.,2012) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c)).  With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis.  A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

*Id.* (*citing* 20 C.F.R. § 404.1545(b)).

Plaintiff is correct that physical limitations are a necessary consideration when determining residual functional capacity.  However, Plaintiff does not show that the ALJ excluded considerations

27

of all of the physical limitations made by Drs. Lefkovitz and Hinzman when making his determination.

The ALJ did not categorically accept Dr. Lefkovitz's conclusions, but he did extensively reference Plaintiff's physical impairments, examinations, and treatments as part of his residual functional capacity analysis (Docket No. 12, pp. 20-23 of 768). In particular, the ALJ considered and gave weight to Dr. Lefkovitz's opinion regarding Plaintiff's ability to lift and carry. He declined to give weight to Dr. Lefkovitz's opinions regarding Plaintiff's other postural limitations because he found they were not supported by the substantial medical record and they were internally inconsistent with his treatment notes which revealed that Plaintiff was not only progressing but may not have been as severely injured as alleged. Since the ALJ gave weight to several of the limitations proffered by Dr. Lefkovitz and provided rationale for declining to give weight to others, it is clear that he appropriately considered Dr. Lefkovitz's opinion in assessing Plaintiff's residual functional capacity.

The ALJ was also required to consider Plaintiff's postural limitations as proffered by Dr. Hinzman in assessing residual functional capacity, but he was not required to categorically accept them. The ALJ considered and gave weight to Dr. Hinzman's opinions regarding Plaintiff's ability to lift, carry, push, pull, sit, stand and walk. The ALJ considered and did not afford weight to Dr. Hinzman's opinions regarding Plaintiff's ability to kneel, stoop, crouch, crawl, and climb because he found that these opinions were inconsistent with the objective medical record as a whole which indicated only mild degenerative changes (Docket No. 12, p. 22 of 768). The ALJ's decision clearly articulates his consideration of Dr. Hinzman's opinions and provides his rationale for accepting only those conclusions that were substantiated.

The medical evidence of record establishes that Plaintiff has a history of degenerative problems from various medical professionals whose opinions were material to the assessment of

28

residual functional capacity.  The ALJ considered these sources also.  Notably, Dr. Wells, conducted postural examinations and consistently found the results unremarkable and his treatment notes revealed no abnormalities.  Similarly, Dr. Lababidi's opinions did not reveal any marked functional limitations.

The ALJ also considered Plaintiff's own hearing testimony that he could only sit for more than fifteen minutes at a time but noted that he remained seated for thirty-five minutes at the hearing without showing signs of discomfort.  The ALJ also considered Plaintiff's range of daily activities in assessing residual functional capacity (Docket No. 12, pp. 20-23 of 768).

Finally, Plaintiff's position that the ALJ failed to consider Dr. Lefkovitz's opinion that he was disabled inappropriately ignores the substantial medical record as a whole and would have been inconsistent with the regulations which clearly indicate that the determination of whether a claimant is disabled is an issue reserved for the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).

 In summary, the medical opinions as a whole do not reach an exact consensus on the severity of Plaintiff's injuries; however, the ALJ considered all of the relevant medical opinions and findings that were supported by substantial evidence in determining Plaintiff's residual functional capacity–Plaintiff can lift, carry, push and pull twenty pounds occasionally and ten pounds frequently; sit for six hours and stand and/or walk for six hours in a normal workday with a brief sit-stand option that allows him to stretch; and continue to work during the sit-stand option (Docket No. 12, p. 20 of 768).  Having appropriately considered the entire record as a whole, the ALJ's determination of Plaintiff's residual functional capacity was consistent with the applicable law and was not a substitution of his own judgment for that of the medical experts.

### VIII. CONCLUSION.

For these reasons, the Magistrate affirms the Commissioner's decision denying Plaintiff's

29

request for SSI and DIB benefits and denies the certificate of appealability.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:    February 26, 2013